## 24-4220(L), 24-4221, 24-4236

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### *for the*

# 𝔉𝔬𝔲𝔯𝔱𝔥 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

---

UNITED STATES OF AMERICA,

*Plaintiff/Appellee*,

— v. —

RONALD DAMONE JENKINS, JR.,
a/k/a G, a/k/a GG, a/k/a Gee, a/k/a Gee Gee,
JAPREE LORTEZ BROOKS, a/k/a Choppa, a/k/a Khoppa, a/k/a Primo,
MALIK TREVONTE NEWSOME,
a/k/a Red, a/k/a Redd, a/k/a Hitman Redd

*Defendants/Appellants*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

## BRIEF OF APPELLANTS

Paul G. Beers
GLENN, FELDMANN, DARBY & GOODLATTE
Post Office Box 2887
Roanoke, Virginia 24001
(540) 224-8035
*Counsel for Appellant Jenkins*

Sicilia Englert
LAW OFFICE OF SICILIA C. ENGLERT, LLC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
(703) 636-2261
*Counsel for Appellant Brooks*

Mark Diamond
ATTORNEY AT LAW
Box 388 Pound Ridge
Pound Ridge, New York 10576
(917) 660-8758
*Counsel for Appellant Newsome*

CP COUNSEL PRESS    (800) 4-APPEAL • (JOB 810560)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................v

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION ...........................................................1

STATEMENT OF THE ISSUES.........................................................1

    I.    WHETHER APPELLANTS' CONVICTIONS ON COUNT
        ONE FOR VICAR CONSPIRACY TO COMMIT MURDER
        SHOULD BE REVERSED FOR EVIDENTIARY
        INSUFFICIENCY? ................................................................1

    II.   WHETHER JENKINS'S CONVICTION ON COUNT FOUR
        FOR VICAR ATTEMPTED MURDER SHOULD BE
        REVERSED FOR EVIDENTIARY INSUFFICIENCY? ....................1

    III.  WHETHER BROOKS'S CONVICTION IN COUNT TWO
        FOR ATTEMPTED MURDER IN AID OF RACKETEERING
        SHOULD BE REVERSED FOR EVIDENTIARY
        INSUFFICIENCY? ................................................................1

    IV.  WHETHER BROOKS'S CONVICTION IN COUNT THREE,
        FOR USE OF A FIREARM DURING AND IN RELATION TO
        A CRIME OF VIOLENCE MUST BE VACATED BECAUSE
        IT IS PREDICATED ON AN UNPROVEN OR INVALID
        OFFENSE? ..........................................................................1

    V.   WHETHER NEWSOME'S CONVICTION ON COUNT NINE
        FOR WITNESS TAMPERING SHOULD BE REVERSED FOR
        EVIDENTIARY INSUFFICIENCY?...................................................2

    VI.  WHETHER THE TRIAL COURT ABUSED ITS
        DISCRETION IN SENTENCING NEWSOME BY REFUSING
        TO GRANT A DOWNWARD VARIANCE FROM THE
        APPLICABLE GUIDELINES RANGE AND BY IMPOSING A
        GUIDELINE ENHANCEMENT FOR OBSTRUCTION OF
        JUSTICE?.............................................................................2

STATEMENT OF THE CASE AND FACTS ....................................................2

    Statement of Relevant Facts ............................................................4

    Brandon's Murder in December 2017 ............................................5

    The December 17-19, 2017, Shootings in Franklin ......................5

    The December 18, 2017 Shooting of Cynthia Barnes's House......6

    The Shooting of Shuntrel McNear on February 8, 2019 ...............8

SUMMARY OF THE ARGUMENTS ......................................................9

ARGUMENTS..........................................................................................11

    I.    THE TRIAL COURT ERRED AS A MATTER OF LAW BY DENYING JENKINS'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS ONE AND FOUR .............................11

        Standard of Review ...........................................................11

        A.    Insufficient Evidence Supports Jenkins's Conviction On Count One For VICAR Conspiracy to Commit Murder Between December 17 and 19, 2017 ........................12

        B.    Insufficient Evidence Supports Jenkins's Conviction On Count Four ...............................................................21

    II.    THE TRIAL COURT ERRED BY DENYING BROOKS'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS ONE, TWO, AND THREE ....................................................23

        Standard of Review ...........................................................23

        A.    Insufficient Evidence Supports Brooks's Conviction On Count One For Conspiracy To Commit Murder In Aid Of Racketeering In Violation of 18 U.S.C. § 1959(a)(5)...............24

B.    The Government Failed To Prove That Brooks Committed Attempted Murder Under Virginia Law By Shooting At Ms. Barnes's House ...................................................27

C.    Brooks's Conviction In Count Three, For Use Of A Firearm In The Attempted Murder Charged In Count Two, Must Be Vacated ......................................................34

    i.    Brooks's conviction for use of a firearm must be vacated because there was insufficient evidence of attempted murder ..........................................35

    ii.    Virginia Attempted Murder is not a Valid Predicate Crime of Violence under 18 U.S.C. § 924(c) ................35

    Conclusion ......................................................38

III.    THERE WAS LEGALLY INSUFFICIENT EVIDENCE THAT NEWSOME CONSPIRED TO COMMIT VICAR MURDER AS CHARGED IN COUNT ONE ......................................38

Standard of Review ..............................................38

Discussion ......................................................39

IV.    THERE WAS LEGALLY INSUFFICIENT EVIDENCE THAT NEWSOME TAMPERED WITH WITNESSES ...............................44

Standard of Review ..............................................44

Discussion ......................................................44

V.    NEWSOME SHOULD HAVE BEEN GRANTED A DOWNWARD SENTENCE VARIANCE AND TWO POINTS SHOULD NOT HAVE BEEN ADDED UNDER U.S.S.G. § 2C1.1 ....................................................46

Standard of Review ..............................................46

Discussion ......................................................46

Conclusion ..................................................................................... 50

CONCLUSION ............................................................................... 51

REQUEST FOR ORAL ARGUMENT .................................................. 51

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

Cases

Baldwin v. Commonwealth,
        274 Va. 276, 645 S.E.2d 433 (2007) ............................................................33

Boyle v. United States,
        556 U.S. 938 (2009)...........................................................................15, 16, 19

Coles v. Commonwealth,
        270 Va. 585, 621 S.E.2d 109 (2005) .....................................................32, 33

Commonwealth v. Kennedy,
        170 Mass. 18, 48 N.E. 770 (1897)................................................................28

Delligatti v. United States,
        U.S. 23-825 (pending) ..................................................................................38

Gall v. United States,
        552 U.S. 38 (2007)..........................................................................11, 46, 49

Glasser v. United States
        315 U.S. 60 (1942)........................................................................................23

Howard v. Commonwealth,
        207 Va. 222, 148 S.E.2d 800 (1966) ...........................................................31

Johnson v. United States,
        559 U.S. 133 (2010).......................................................................................37

Jones v. Commonwealth,
        70 Va. App. 307, 826 S.E.2d 908 (Va. Ct. App. 2019) (en banc).....28, 30, 33

Leocal v. Ashcroft,
        543 U.S. 1 (2004)...........................................................................................37

Lewis v. Commonwealth,
        15 Va. App. 337, 423 S.E.2d 371 (Va. Ct. App. 1992)...............................31

Rita v. United States,
    551 U.S. 338 (2007)......................................................................49

Secret v. Commonwealth,
    296 Va. 204, 819 S.E.2d 234 (2018) ......................................29, 32

Thacker v. Commonwealth,
    134 Va. 767, 114 S.E.2d 504 (1922) ......................................31, 32

United States v. Booker,
    543 U.S. 220 (2005)......................................................................49

United States v. Burgos,
    94 F.3d 849 (4th Cir. 1996) (en banc) ........................................23

United States v. Davis,
    139 S.Ct. 2319 (2019)..................................................................36

United States v. Davis,
    53 F.4th 168 (4th Cir. 2022) ........................................................36

United States v. Davenport,
    445 F.3d 366 (4th Cir. 2006) .......................................................50

United States v. Devine,
    40 F.4th 139 (4th Cir. 2022) ..................................................14, 16

United States v. Fiel,
    35 F.3d 997 (4th Cir. 1994) ...................................................passim

United States v. Jones,
    2023 U.S. App. LEXIS 30545 (4th Cir. 2023)......................11, 49

United States v. Kellam,
    568 F.3d 125 (4th Cir. 2009) .......................................................23

United States v. Lassiter,
    96 F.4th 629 (4th Cir. 2024).............................................28, 36, 37

United States v. Manley,
        52 F.4th 143 (4th Cir. 2022) .......................................................10, 36, 37, 40

United States v. Mathis,
        932 F.3d 242 (4th Cir. 2019) ...........................................................14, 36, 37

United States v. Napan,
        484 Fed. Appx. 780 (4th Cir. 2012) ............................................................50

United States v. Pinson,
        860 F.3d 152 (4th Cir. 2017) ...................................................................20, 21

United States v. Redd,
        85 F.4th 153 (4th Cir. 2023) ........................................................................36

United States v. Rodriguez,
        828 Fed. Appx. 186 (4th Cir. 2020) ...........................................................48

United States v. Simmons,
        11 F.4th 239 (4th Cir. 2021) ...................................................................28, 35

United States v. Smith,
        451 F.3d 209 (4th Cir. 2006) .......................................................................23

United States v. Taylor,
        596 U.S. 845 (2022).......................................................................................36

United States v. Taylor,
        979 F.3d 203 (4th Cir. 2020) .......................................................................37

United States v. Turkette,
        452 U.S. 576 (1981).......................................................................................20

United States v. Wysinger,
        64 F.4th 207 (4th Cir. 2023) ........................................................................11

United States v. Zelaya,
        908 F.3d 920 (4th Cir. 2018) .......................................................................23

Viney v. Commonwealth,
    269 Va. 296, 609 S.E.2d 26 (2005) ................................................................29

Constitutional Provisions

U.S. Const. Amend. V ...................................................................................10

Statutes

18 U.S.C. § 922(g)(1) .....................................................................................3

18 U.S.C. § 924 ......................................................................................passim

18 U.S.C. § 1512 ...........................................................................3, 10, 44

18 U.S.C. § 1959 ..................................................................................passim

18 U.S.C. § 1961(4) ...................................................................................13

18 U.S.C. § 3231 ...........................................................................................1

18 U.S.C. § 3553 ..................................................................................passim

18 U.S.C. § 3742 ...........................................................................................1

28 U.S.C. § 1291 ...........................................................................................1

Va. Code Ann. § 18.2-18 ...........................................................................27

Va. Code Ann. § 18.2-26 ...........................................................................27

Va. Code Ann. § 18.2-32 .......................................................................27, 37

Rules and Regulations

Rule 29 of the Federal Rules of Criminal Procedure ...........................11, 13, 23, 39

Other Authorities

J.H. Beale, Jr. *Criminal Attempts*, 16 Harv. L. Rev. 491 (1903) ...........................28

United States Sentencing Guidelines .......................................................11, 46, 47, 50

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because the appellants were charged with offenses against the United States. The United States Court of Appeals for the Fourth Circuit has jurisdiction under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

The court below entered final judgments against Ronald Damone Jenkins, Jr. ("Jenkins"), Japree Lortez Brooks ("Brooks"), and Malik Trevonte Newsome ("Newsome") on April 16, 2024, April 18, 2024, and April 23, 2024, respectively. (JA1881, JA2022, JA2084.) Timely notices of appeal were filed by Jenkins on March 29, 2024 (JA1797); Brooks on April 20, 2024 (JA2029); and Newsome on April 29, 2024 (JA2091). The appeals were consolidated on May 1, 2024. (JA13.)

## STATEMENT OF THE ISSUES

I. WHETHER APPELLANTS' CONVICTIONS ON COUNT ONE FOR VICAR CONSPIRACY TO COMMIT MURDER SHOULD BE REVERSED FOR EVIDENTIARY INSUFFICIENCY?

II. WHETHER JENKINS'S CONVICTION ON COUNT FOUR FOR VICAR ATTEMPTED MURDER SHOULD BE REVERSED FOR EVIDENTIARY INSUFFICIENCY?

III. WHETHER BROOKS'S CONVICTION IN COUNT TWO FOR ATTEMPTED MURDER IN AID OF RACKETEERING SHOULD BE REVERSED FOR EVIDENTIARY INSUFFICIENCY?

IV. WHETHER BROOKS'S CONVICTION IN COUNT THREE, FOR USE OF A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE MUST BE VACATED BECAUSE IT IS PREDICATED ON AN UNPROVEN OR INVALID OFFENSE?

V.    WHETHER NEWSOME'S CONVICTION ON COUNT NINE FOR WITNESS TAMPERING SHOULD BE REVERSED FOR EVIDENTIARY INSUFFICIENCY?

VI.   WHETHER THE TRIAL COURT ABUSED ITS DISCRETION IN SENTENCING NEWSOME BY REFUSING TO GRANT A DOWNWARD VARIANCE FROM THE APPLICABLE GUIDELINES RANGE AND BY IMPOSING A GUIDELINE ENHANCEMENT FOR OBSTRUCTION OF JUSTICE?

<u>**STATEMENT OF THE CASE AND FACTS**</u>

This is an appeal from final judgments entered by the United States District Court for the Eastern District of Virginia (Norfolk). Appellants were charged together in a Second Superseding Indictment dated September 27, 2023. (JA81). The grand jury alleged that the three men, along with others, participated in a racketeering "enterprise" as defined in 18 U.S.C. § 1959(a) ("VICAR"). The alleged enterprise planned to kill members of the "00 Gang." A Tidewater, Virginia set of the Crips, the grand jury charged.

Count One of the Second Superseding Indictment charged Jenkins, Brooks, and Newsome with VICAR conspiracy to commit murder in aid of racketeering during the closed period between December 17 and 19, 2017 (18 U.S.C. § 1959(a)(5)). In Count Two, Brooks was charged with VICAR attempted murder in aid of racketeering on December 18, 2017 (18 U.S.C. § 1959(a)(5)). In Count Three, the grand jury charged Brooks with discharging a firearm during a crime of violence on December 18, 2017. 18 U.S.C. § 924(c)(1)(A).

Counts Four, Five, and Six were interconnected charges directed at Jenkins. In Count Four the grand jury charged Jenkins with attempted murder in aid of racketeering of Shuntrel McNear on February 8, 2019, in violation of 18 U.S.C. § 1959(a)(5). In Count Five Jenkins was charged under 18 U.S.C. § 924(c) with discharging a firearm during that violent crime on February 8, 2019, while Count Six charged him with unlawful possession of ammunition on the same date as a previously convicted felon. See 18 U.S.C. §§ 922(g)(1); 924(a)(2).

Counts Seven, Eight, and Nine were obstruction of justice charges against Brooks and Newsome under 18 U.S.C. § 1512(b). Count Seven charged Brooks with witness tampering and obstruction of an official proceeding on May 18, 2023. Count Eight charged Brooks with witness tampering and obstruction of an official proceeding on September 12, 2023. Count Nine charged Newsome with witness tampering and obstruction of an official proceeding on July 31, 2023.

Following a jury trial, Jenkins was convicted on Counts One, Four and Six and acquitted of the Section 924(c) charge in Count Five. Brooks was convicted on Counts One, Two, Three, Seven and Eight. Newsome was found guilty on Counts One and Nine. (JA1791, JA1794, JA1796).

Jenkins was sentenced to 300 months in prison and Brooks to 420 months on April 16, 2024, and April 18, 2024, respectively. (JA1882, JA2023). On April 23, 2024, Newsome received 273 months in prison and three years of supervised release.

The district court ordered that Newsome's sentences run consecutively to prison sentences imposed for prior convictions of 27 months for felon in possession of a firearm and 33 months for violating supervised release because of the same firearm. (JA2085).

### Statement of Relevant Facts[1]

Brandon Leonard ("Brandon") led a local gang known as the "Low Lives" in the small city of Franklin in eastern Virginia. The Low Lives was not affiliated with any national gangs such as the east coast United Bloods Nation ("UBN" or "the Bloods") or the Bloods' traditional rival, the Lost Angeles-based Crips. (JA1153).

The Low Lives earned money by distributing drugs in and around Franklin until Brandon went to state prison in 2015. While he was incarcerated, Brandon became a Blood, eventually earning the relatively exalted rank of "Big Homie." The Low Lives, meanwhile, faded to the vanishing point in Brandon's absence. (JA1160).

Upon his release from incarceration, Brandon promptly returned to Franklin and resumed his vocation as a retail-level distributor of controlled substances. (JA1167-1168). He recruited several relatives and friends to join a set of the Bloods known as "the Brim."

---

[1] In keeping with controlling legal standards, the facts here are summarized in the light most favorable to the United States as the prevailing party below.

Brandon and his brother Edward Leonard ("Edward") lived in a rented Franklin residence on Railroad Avenue commonly called the "Railroad." Jenkins, Brooks, and Newsome frequently visited the Leonard brothers at the Railroad. (JA1162).

<u>Brandon's Murder in December 2017</u>

In December 2017 Brandon, known around Franklin as "Lil B," got into an altercation over a firearm sale in a "shot house" (an after-hours drinking establishment) with a member of the 00 Gang. This dispute climaxed with Brandon drawing and brandishing a pistol directly at the 00 Gang member, whose street name is "Tooth." The standoff ended abruptly with no shots fired by Brandon or Tooth.

Within 48 hours of his shot house run-in with Tooth, Brandon was dead. A search party found Brandon's bullet-riddled body in a secluded ditch on December 18, 2017. Edward and others close to the deceased "Big Homie" quickly surmised Tooth and his fellow 00 Gang members killed Brandon. (JA1189).

<u>The December 17-19, 2017, Shootings in Franklin</u>

Immediately after the discovery of Brandon's body, Edward, Jenkins, and others close to the decedent planned to avenge his death. On December 18 and again on December 19, 2017, Edward, Brooks and others carried out drive-by shootings in Franklin. Their targets were residences of 00 Gang members and their family members. (JA1192-1994). The government argued at trial that these shootings were

5

more than property crimes.  According to the government, the shootings by Brandon's family and friends on December 18 and 19, 2017, were manifestations of a premeditated and malicious plan to murder members of the 00 Gang in reprisal for Brandon's death.  (JA1621-1622).

<u>The December 18, 2017 Shooting of Cynthia Barnes's House</u>

Edward testified that after Brandon was found dead, people gathered at Railroad and talked about his murder.  They thought that "Tooth" and "Trell" killed Brandon and they talked about how they were going to retaliate.  (JA1189).  Edward testified in general terms his belief that murder was on everybody's mind, and everyone in the house was participating in the discussion, but he did not specify any statements made by anyone present.  (JA1190).  They left Railroad to search for Tooth and Trell, but could not find them.  (JA1190).  They then stopped at Monta's house.  Edward was in a car with his cousin "Sweets," and Brooks was in the driveway.  Edward recalled that Brooks carried a .45 pistol and there was an AR-15 rifle in the passenger's seat of Brooks's car.  (JA1190-1991, JA1315-1316).  After talking to Monta for approximately five minutes, they left to continue their search.  (JA1191).  At that time, Edward also had an AR-15.  (JA1192).

Edward again drove in the same car with Sweets, and Brooks drove alone directly behind them.  (JA1192).  Not long after leaving Monta's house, Edward

heard three to four rifle shots. (JA1193). After a second, Edward looked back and saw gunfire. (JA1193).[2]

According to Edward, it was well-known that Tooth's mother, Cynthia Barnes, lived five or six houses from Monta's house. (JA1193.) Tooth and his brother had stayed at that house at some time, but Edward did not specify when they last stayed there. (JA1194.) After the shots, they kept driving and later returned to Railroad. (JA1194). Edward asked Brooks, "Hey, you shot that jank up?" and Brooks said, "Yeah, I shot that jank up." (JA1194).

Cynthia Barnes testified that she lived alone in a single family house at 2200 South Street, in Franklin Virginia. (JA569). During her 18-year residence there, her sons, Lorenzo and Loron (Tooth), had lived with her at some point, but she did not specify when. (JA569). She testified that on December 18, 2017, she was in bed asleep when, at approximately 3:00 a.m., she woke to the sound of gunshots. (JA569-570). One bullet hit her house above the front door; a second came into her house above her bedroom window, hit the ceiling fan, and ricocheted off the wall

---

[2] On cross examination, Edward admitted that his statements to law enforcement officers were inconsistent regarding the South Street shooting. At first, Edward said that he did not know who shot up Tooth's mother's house. (JA1272). In November 2020, Edward claimed that Brooks *said* he shot into the house, but Edward did not mention himself seeing gunfire. (JA1258). Edward also said that he did not see Brooks with a rifle on the night the house was shot up. (JA1261). Subsequently, Edward changed his statement to say that he saw a rifle in Brooks' car and saw Brooks shoot into the house. (JA1258-1259, JA1261).

(JA570); and a third hit over her attic. (JA570).[3] Upon hearing gunshots, Barnes sat up and went into the bathroom to call 911. (JA570). On cross examination, Barnes confirmed that, at the time of the gunshots, all of the lights in the house were turned off. (JA575-576). Subsequently, law enforcement officers recovered three 5.56 cartridge casings near the house—two from the sidewalk across the street from the residence, and one approximately 50 yards away (JA553, JA565).

<u>The Shooting of Shuntrel McNear on February 8, 2019</u>

On February 8, 2019 (Brandon's birthday), 00 Gang member Shuntrel McNear ("McNear") posted on his Instagram account a sarcastic video singing "Happy Birthday" to Brandon. McNear also posted on Instagram a photo of a scoreboard which indicated a score of "0-1," along with a message "Ain't nobody from 00 got hit . . . but lil b did[.] . . . Check the scoreboard 0-1." (JA2379). These internet taunts prompted Edward and Jenkins to attack McNear later in the evening on that date, February 8, 2019.

Edward and Jenkins were at a store together in Franklin on the night of February 8, 2019, when they spotted McNear across the street. After retrieving firearms, they drove to Franklin's Wilson Street in Jenkins' car. After parking, Jenkins and Edward discharged multiple rounds into another parked car occupied by

---

[3] Barnes testified that she heard approximately four or five gunshots. (JA570).

McNear and a companion. McNear, struck by at least two bullets, survived after undergoing surgeries. (JA1476).

## SUMMARY OF THE ARGUMENTS

I.     In Section I of this Brief of Appellants, Jenkins challenges the sufficiency of the evidence supporting his VICAR convictions under 18 U.S.C. § 1959(a)(5) on Counts One and Four. Neither conviction should stand. The United States failed to prove beyond a reasonable doubt that "Brandon's crew" constituted an "enterprise" within the meaning of 18 U.S.C. § 1959(b)(2). While an "enterprise" may be an informal association-in-fact, it must have four essential characteristics: continuity, unity, shared purpose, and identifiable structure. The alleged enterprise, "Brandon's crew," lacked these attributes. The individuals who comprised the alleged enterprise did not engage in the charged racketeering activity (narcotics distribution) as members of a functionally integrated and identifiable partnership or joint venture. Each supposed member of Brandon's crew acted as an independent venturer or sole proprietor when he brought and resold drugs. Because the government failed to prove the essential enterprise element, the Court should reverse Jenkins's two VICAR convictions.

II.     Brooks joins and adopts the arguments made by Jenkins and Newsome, that his conviction under Count One for conspiracy to commit attempted murder in aid of racketeering, must be reversed because there was insufficient evidence of an

enterprise. Next, there was insufficient evidence to convict Brooks of attempted murder as charged in Count Two, based on three shots fired into a house. There was no evidence that anyone was at home; there was insufficient evidence of intent to murder because the shots were all fired high above where anyone was likely to be; and there was no evidence that Brooks was attempting to maintain or increase his position in any purported enterprise. Finally, Brooks's conviction in Count Three, for use of a firearm in the crime of violence charged in Count Two, must be vacated—first, because there was insufficient evidence that Brooks committed attempted murder and, second, because Virginia attempted murder can be committed without the use of force required for a predicate offense under 18 U.S.C. § 924(c).

III. The Government failed to prove the conspiracy to murder underlying Count 1 was committed by the appellants for RICO purposes, a necessary element under 18 U.S.C. § 1959(a)(5). U.S. Const. 5th Amend.; *United States v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994); *United States v. Manley*, 52 F.4th 143, 153 (4th Cir. 2022).

IV. The Government failed to prove that Newsome encouraged two witnesses to give false testimony or that he did so through intimidation, threats, or corrupt persuasion. U.S. Const. 5th Amend.; 18 U.S.C. § 1512(b)(1); *United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994).

V.    The district court erred in refusing to grant a downward variance in Newsome's Guidelines sentence and imposing two points under U.S.S.G. § 3C1.1 for obstructing justice. 18 U.S.C. § 3553(a); *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Jones*, 2023 U.S. App. LEXIS 30545 (4th Cir. 2023).

## ARGUMENTS

## I.[4]    THE TRIAL COURT ERRED AS A MATTER OF LAW BY DENYING JENKINS'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS ONE AND FOUR.

### Standard of Review

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Jenkins moved for judgment of acquittal on Counts One and Four of the Second Superseding Indictment at the close of the government's case-in-chief. (JA1485-1486). The trial court erroneously denied this motion for acquittal, which Jenkins renewed prior to jury deliberations. (JA1321).

Jenkins's appellate challenge to the sufficiency of the evidence supporting his VICAR convictions on Counts One and Four is reviewed de novo. In conducting its de novo examination, the Court views the evidence in the light most favorable to the United States. The jury's verdict must be affirmed unless the Court is convinced it is unsupported by substantial evidence. *United States v. Wysinger,* 64 F.4th 207, 211 (4th Cir. 2023).

---

[4] Section I of Appellants' Brief was drafted primarily by counsel for Jenkins.

A.    <u>Insufficient Evidence Supports Jenkins's Conviction On Count One For VICAR Conspiracy To Commit Murder Between December 17 and 19, 2017</u>.

Count One of the Second Superseding Indictment charges Jenkins and others under 18 U.S.C. § 1959(a)(5) with participating in a VICAR conspiracy over the three-day period between December 17 and 19, 2017, in Franklin, Virginia. (JA81-85). According to the grand jury, Jenkins and other defendants were ". . . members and associates of the Franklin Enterprise." (JA82). While the Franklin Enterprise was not affiliated or associated with the UBN, it followed or copied many of the Bloods' practices and "rules," the grand jury charged in paragraph 3 of the Second Superseding Indictment. (JA82).

The spoke of the VICAR conspiracy alleged in Count One was Brandon, a Bloods "Big Homie," who resided in Franklin with his brother, Edward, a fellow Blood turned star prosecution witness. The Leonard brothers lived in a residence on Railroad Avenue commonly called simply the "Railroad."

Using the Railroad as a base of operations, "Enterprise members and associates distributed narcotics in Franklin, Virginia with [Brandon's] permission," the grand jury alleged in paragraph 6 of the Second Superseding Indictment. (JA83). In the immediate aftermath of Brandon's death by gunshot in December 2017, Jenkins and other members of the Franklin Enterprise, or "Brandon's crew,"

purportedly conspired to murder members of the 00 Gang, who Brandon's family believed had murdered him.  (JA85).

To withstand Jenkins's Rule 29 motion at trial on Count One, the government had to present evidence sufficient for rational jurors to find beyond any reasonable doubt that (1) an "enterprise" existed within the meaning of 18 U.S.C. § 1959(a); (2) the qualifying enterprise was engaged in racketeering activity; (3) Jenkins had a "position" in the alleged enterprise; (4) Jenkins conspired with the enterprise to murder members or associates of the Crips-affiliated 00 Gang; and (5) Jenkins's "general purpose in doing so was to maintain or increase his position in the enterprise." *See United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994).

Insufficient evidence exists that the "Franklin Enterprise" alleged in the Second Superseding Indictment, renamed "Brandon's crew" at trial, met the requirements for an "enterprise" within the meaning of the VICAR statute, 18 U.S.C. § 1959(a).  An "enterprise" for VICAR purposes has substantially the same meaning as it does in the RICO context.  *Compare*, 18 U.S.C. § 1959(b)(2) (VICAR) *with* 18 U.S.C. 1961(4) (RICO); *Fiel*, 35 F.3d at 1003 ("The legislative history of the [VICAR] statute indicates that enterprise in this section and in RICO are intended to have the same scope") [internal citations omitted].  An association-in-fact or other informal entity may qualify as an "enterprise" under both RICO and VICAR, provided it has four characteristics: continuity, unity, shared purpose, and

identifiable structure. *United States v. Devine*, 40 F.4th 139, 149 (4th Cir. 2022) ("The 'hallmark concepts' that identify RICO enterprises are 'continuity, unity, shared purpose and identifiable structure.'") (*quoting Fiel*, 35 F.3d at 1003).

In RICO and VICAR prosecutions targeting notorious gangs such as the Bloods and Crips, the Department of Justice typically establishes the threshold "enterprise" element by proving the racketeering organization operated in accordance with a set of rules and standardized practices with respect to initiation rites, participation expectations, and discipline. These prototypical features of gangs, while not necessary in every case, often amount to sufficient ". . . evidence of a functioning 'enterprise.'" *United States v. Mathis*, 932 F.3d 242, 259 (4th Cir. 2019). In *Devine*, 40 F.4th Cir. at 149, for instance, the United States Court of Appeals for the Fourth Circuit held that evidence of gang rules and rites of passage proved an outlaw association-in-fact, known "as the Gangstas," had sufficient unity, shared purpose and structure to constitute a RICO enterprise.

> The government properly introduced evidence to prove this "enterprise" element. Testimony on the "beat in" initiations, gang rules, gang meetings, gang discipline, collection of dues, acts of violence carried out at the direction of gang superiors, and gang promotion for "putting in work" all support the jury's conclusion that the Gangstas constituted a RICO enterprise.

*Devine*, 40 F.3d at 149.

The government presented no such evidence here with respect to "Brandon's crew." Although the grand jury in the Second Superseding Indictment alleged this

supposed enterprise copied Bloods "rules," the government's witnesses at trial made clear this was not so. For instance, Tony Sledge ("Sledge"), called to the stand by the government, testified that neither Jenkins nor any other drug dealers who frequented the Railroad paid dues, or "tithes," to Brandon or his "crew." (JA816). Sledge also testified that the Bloods' initiation rites were not replicated by Brandon or anyone else at the Railroad. (JA818). Sledge was unequivocal that the men who congregated at the Railroad did not interact or function as members of the Bloods, Low Lives, or any other "gang" under Brandon's control.

> Q. So when you talked about how people just hung out at Railroad, everybody that hung out at the Railroad house with the Leonards, they weren't Bloods, were they?
>
> A. No.
>
> Q. Nobody sat around and answered to Brandon Leonard, did they?
>
> A. No.
>
> Q. Brandon Leonard didn't tell people what to do and tell people to go out in the street, did he?
>
> A. No.
>
> Q. Was everybody that hung out at that house in a gang together?
>
> A. No.

(JA818-819).

The government is certain to cite *Boyle v. United States*, 556 U.S. 938 (2009) for the settled proposition that an "enterprise" in the RICO arena need not have a ".

. . hierarchical structure or a 'chain of command.'" Id. at 948. Jenkins readily acknowledges *Boyle* is controlling precedent on the elements of a RICO or VICAR "enterprise." But case law in *Boyle's* wake nonetheless confirms that an "identifiable structure," unity, and joint purpose are the *sine qua non* of any RICO or VICAR enterprise. Without an identifiable structure, unity, and joint purpose, a group of friends or confederates does not form a sufficiently organized operational unit to subject the individuals to enterprise liability under RICO or VICAR. *Devine*, 40 F.4th at 149. "Brandon's crew" was not an enterprise because it lacked identifiable structure, unity, and common purpose.

The government's theory below was that Jenkins and others who frequented the Railroad formed a racketeering enterprise led by Brandon, even if they never were members of the moribund Low Lives or resurgent Bloods.[5] Brandon's crew was an enterprise distinct from the various Bloods sets and other recognized gangs in Franklin, including the defunct Low Lives, prosecutors insisted. The purpose of Brandon's eponymous enterprise was to distribute controlled substances, thundered the prosecution in closing arguments.

> The enterprise in this case is the group of guys that you have heard about for the last week. It's Brandon's crew.

(JA1614).

---

[5] Significantly, at no point did Jenkins belong to either the Low Lives or the Bloods. (JA1616).

In the government's creative retelling of the trial evidence, this asserted enterprise engaged in interstate racketeering by selling controlled substances throughout the Franklin community. "Brandon's crew" purchased narcotics from a North Carolina-based seller whose moniker was "Weezy," prosecutors reminded jurors in closing.

> . . . The racketeering activity in this case is drug dealing. It's very simple. . . . Brandon's crew, this group, this enterprise, all got their drugs from Weezy, and Weezy lived in North Carolina, and we're talking about Franklin, Virginia.

(JA1615).

Reduced to its essentials, then, the government's argument that "Brandon's crew" was a VICAR "enterprise" hinges on the notion that this group of men, led by Brandon, jointly engaged in the racketeering predicate of drug distribution in and around Franklin.

This enterprise theory collapses at the threshold. Government witnesses made clear Jenkins and others in Franklin who sold drugs supplied by Weezy did so as autonomous distributors rather than as constituents of a cohesive unit or joint venture.

Testimony of the government's central witness, Edward, thoroughly drowned out the government's refrain that Jenkins and others sold drugs as members of an integrated - or even loosely structured - enterprise directed by his late brother, Brandon. Edward testified that Brandon did not front or redistribute at wholesale

17

prices Weezy's products to Jenkins and others for street-level transactions with addicts. Instead, Jenkins and other putative members of "Brandon's crew" bought directly from Weezy using their own funds, just as Brandon bought from that supplier with his funds. Weezy's customers in Franklin did not pool resources, share profits, or contribute to a common fund overseen by Brandon.

Far from a joint venture, this was a collection of entrepreneurs. Edward's testimony makes clear the several dealers' parallel criminal conduct did not create a unitary or functionally integrated racketeering enterprise.

> Q.    Did Brandon buy all the drugs from Weezy and hand them out to other people?
>
> A.    No, I don't think so.
>
> Q.    You never saw this?
>
> A.    No.
>
> Q.    As far as you know, everybody bought drugs from Weezy and sold them on their own?
>
> A.    Yes.
>
> Q.    Including G?[6]
>
> A.    Yes.
>
> Q.    You never saw G get drugs from Brandon to sell, did you?
>
> A.    No.

---

[6] Jenkins's nickname is "G."

Q.     As far as you know, G got his own supply, and he handled his own business?

A.     Yes.

Q.     And you did the same, right?

A.     Yes.

Q.     In fact, you guys didn't even sell the same products?

A.     No.

(JA1288-1289).

Other prosecution witnesses corroborated Edward's testimony that "Brandon's crew" was comprised of independent distributors rather than subordinate agents of Brandon working in a joint venture with an identifiable structure.  See testimony of T. Sledge, JA816-817, and T. Griffin, JA535.

Under the Supreme Court's in depth analysis of RICO requirements in *Boyle*, "Brandon's crew" was not an "enterprise."  Justice Alito, author of the majority opinion in *Boyle*, envisaged a set of facts closely akin to the set presented here.

> It is easy to envision situations in which proof that individuals engaged in a pattern of racketeering activity would not establish the existence of an enterprise.  For example, suppose that several individuals, independently and without coordination, engaged in a pattern of crimes listed as RICO predicates--for example, bribery or extortion.  Proof of these patterns would not be enough to show that the individuals were members of an enterprise.

*Boyle*, 556 U.S. at 948 and note 4.

Instructive as well on this crucial point is *United States v. Pinson*, 860 F.3d 152 (4th Cir. 2017), where the United States Court of Appeals for the Fourth Circuit reversed a RICO conspiracy conviction for insufficient evidence of an "enterprise." The *Pinson* Court emphasized that an association-in-fact enterprise within the meaning of RICO consists of "'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Pinson*, 860 F.3d at 162 (*quoting United States v. Turkette*, 452 U.S. 576, 583 (1981)).  A jury convicted Pinson of conspiring to run a racketeering enterprise that encompassed four commercial ventures.  The Fourth Circuit reversed Pinson's RICO conspiracy conviction because illicit gains accrued to each venturer.  Profits were not pooled or redistributed among persons who comprised the alleged enterprise.  The overarching purpose of self-enrichment that animated each of the four ventures was not specific enough to fulfill the integrated functions requirement of every RICO enterprise.

> The purpose of each venture here was to enrich its members, yet any fruits of these ventures accrued only to members of each venture. Any illicit profits did not carry over to the members of the other ventures. Indeed, given the lack of overlapping members between the ventures, any such profits *could not* carry over.

*Pinson*, 860 F.3d at 162 [emphasis in original].

Similarly, here the several individuals whom the government claimed below operated a cohesive, association-in-fact enterprise, actually were sole proprietors. They were not joint venturers. Each operated his own drug distribution venture. As

20

in *Pinson*, ". . . any fruits of these ventures accrued only to members of each venture." *Id.* at 162.

In sum, Jenkins's conviction on Count One for VICAR conspiracy should be reversed because the government failed to prove "Brandon's crew" was an association-in-fact enterprise.

B.  <u>Insufficient Evidence Supports Jenkins's Conviction On Count Four</u>.

Jenkins is charged under 18 U.S.C. § 1959(a)(5) with attempted VICAR murder of Shuntrel McNear in Count Four of the Second Superseding Indictment. (JA88).  According to the government, Jenkins attempted to commit this homicide in February 2019 in order to maintain or enhance his position in the "enterprise" prosecutors at trial began calling "Brandon's crew."  (JA1619).

Jenkins is not guilty of committing attempted VICAR murder under Section 1959(a)(5) in February 2019 for many of the same reasons he is not guilty of VICAR conspiracy to commit VICAR murder under Section 1959(a) in December 2017. Indeed, the evidence in support of Jenkins's conviction on Count Four is even weaker than the evidence in support of his VICAR conspiracy conviction on Count One.

As discussed <u>supra</u>, the government's theory at trial was that Brandon led a VICAR enterprise described as "Brandon's crew."   In closing arguments, prosecutors doubled down on their theme that Brandon was "the boss" who presided

over the purported enterprise. (JA1703). But by February 2019, Brandon was 14 months dead. The "crew" dispersed shortly after Brandon's murder. Soon after Brandon went to his reward, Edward vacated Railroad. (JA1212). Other members of the alleged "crew" moved away from Franklin or became incarcerated. While Jenkins and Edward continued their friendship, the record does not establish beyond a reasonable doubt that any of the other persons the government identified as members of "Brandon's crew" maintained close contact with Edward and Jenkins by the end of 2018. As the prosecutor observed during closing arguments, by the time Shuntrel McNear was shot and wounded in February 2019, neither Brooks nor Newsome was still around. The prosecutor "guess[ed]" that two other crew members may have remained besides Edward and Jenkins when the 00 Gang posted its "Happy Birthday" video on February 7, 2019.

> Prosecutor.  . . . At this point [February 8, 2019], Mr. Brooks is gone. Mr. Newsome is gone. E.J. and G are two of the only guys left along with, I guess, Bird and Monta, and they could not ignore this, and they didn't.

(JA1619).

In short, the government failed to prove beyond a reasonable doubt that "Brandon's crew" existed as an enterprise on February 8, 2019, when Jenkins allegedly attempted to murder Shuntrel McNear. The Court therefore should reverse Jenkins's convictions on Count Four for VICAR attempted murder in violation of 18 U.S.C. § 1959(a)(5).

22

## II.[7] THE TRIAL COURT ERRED BY DENYING BROOKS'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS ONE, TWO, AND THREE.

Standard of Review

At the close of the government's case, Brooks moved for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure on all counts in which he was charged, Counts One, Two, Three, Seven and Eight. (JA1481), which was denied by the trial court. (JA1502). After the verdict was rendered, Brooks's renewed motion was denied. (JA1789).

This court reviews de novo, the district court's denial of a motion for judgment of acquittal. *See United States v. Kellam*, 568 F.3d 125, 132 (4th Cir. 2009). The verdict must be supported by "substantial evidence." *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)). "Substantial evidence" is "evidence sufficient for a reasonable jury to find proof beyond a reasonable doubt of each element of the charged offense." *United States v. Zelaya*, 908 F.3d 920, 925-26 (4th Cir. 2018) (citing *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006)). This court views the evidence and draws reasonable inferences in the light most favorable to the government. *Smith*, 451 F.3d at 216.

---

[7] Section II of Appellants' Brief was drafted primarily by counsel for Brooks.

A.    <u>Insufficient Evidence Supports Brooks's Conviction On Count One For Conspiracy To Commit Murder In Aid Of Racketeering In Violation Of 18 U.S.C. § 1959(a)(5).</u>

Brooks adopts and incorporates by reference the arguments made by Jenkins and Newsome, that the trial court should have granted the appellants' motions for judgment of acquittal on Count One.   The government failed to prove (1) the existence of an "enterprise" under 18 U.S.C. §1959(a); (2) the enterprise was engaged in racketeering activity; (3) Brooks had a position in the enterprise; (4) Brooks committed the alleged crime of violence; and (5) his general purpose in doing so was to maintain or increase his position in the enterprise.  *See Fiel*, 35 F.3d at 1003.  In addition to Jenkins's arguments, Brooks adds the following.

The government admitted that the purported enterprise did not behave like a typical street gang.   The Second Superseding Indictment states, "members and associates of the Enterprise maintained a unique relationship with the Crip-affiliated neighborhood gang, the '00 Gang' ("00").   For example, Enterprise members and associates and 00 members and associates were non-violent in some social settings." (JA83).

As for the Low Lives, Sledge testified, "It was just a group of guys. . . . I think it was just a group of friends that started out from when they were little or something."  (JA761).   While the government argued that the purpose of the enterprise was drug trafficking, different people sold different types of drugs.   There

was no evidence that Brandon or anyone else controlled what, how, where, when, or to whom, each person wanted to sell. Each individual sold what they wanted. According to Edward, Jenkins sold crack cocaine; Brooks sold crack and powder; Kahalil Wiggins sold marijuana; and Monta Newsome sold crack. (JA1773).

The government portrayed Railroad as the base of operations for the purported racketeering enterprise, but the government's own witnesses offered contrary evidence. Tony Sledge testified that Railroad was a neighborhood "chill spot" or "hangout" where people might shoot dice. (JA740-741). Admittedly, Edward or whoever had drugs at that time was selling them, but Sledge did not identify any other people. (JA741). He also testified that he himself never saw drug transactions, but heard about it. (JA741). Thus, Railroad was a social gathering place, and some people who went there sold drugs. It was not a members-only club house exclusive to purported "Franklin Enterprise" members. It cannot be inferred, therefore, that anyone who went to Railroad was a member of any enterprise.

Even if, *arguendo*, there was an enterprise, there was insufficient evidence that Brooks was a member; or that he had any "position" in the enterprise; or that he engaged in any activity for the purpose of maintaining or increasing any such position. Sledge testified that Brooks would come around Railroad approximately "once a month maybe." (JA760).

25

Q.    Okay. And what did he do when he was there?

A.    Games, come chill. That's all we did, was chill and shoot dice every now and then, whatever we wanted.

Q.    Did you know if he took part in any of the narcotics trade that you talked about earlier?

A.    I don't know.

Q.    Okay. You don't know of him participating at all?

A.    No.

(JA760).   The government's evidence showed that Brooks occasionally went to Railroad to socialize.  His presence at Railroad where he socialized "once a month maybe" was insufficient to prove membership in any purported enterprise.

Finally, there was insufficient evidence that Brooks's actions were motivated by maintaining or increasing a position in any purported enterprise.  It appears that Brandon was well-liked, and people enjoyed socializing at his house at Railroad. Certainly, Brandon's death was devastating to those who knew him.  Griffin testified that Brooks was crying after he learned of Brandon's death.  (JA545).  It would be natural to want to seek justice.  However, even if, *arguendo*, Brooks felt like killing someone after Brandon's murder, there was insufficient evidence that it was part of a racketeering conspiracy rather than his personal feeling of wanting to avenge his friend's death.

It is undisputed that many people gathered at Railroad upon news of Brandon's death, but a conspiracy to murder in aid of racketeering requires more than what the government was able to show here. The government introduced insufficient evidence from which to infer the existence of an enterprise, or that Brooks joined in any conspiracy to commit murder in aid of racketeering. Accordingly, Mr. Brooks's conviction for Count One must be reversed.

B.    The Government Failed To Prove That Brooks Committed Attempted Murder Under Virginia Law By Shooting At Ms. Barnes's House.

Count Two charged Brooks with murder in aid of racketeering for the incident in which Cynthia Barnes's house was shot at on December 18, 2017. The Second Superseding Indictment alleges that Brooks, "for the purpose of maintaining and increasing position in the Franklin Enterprise, an enterprise engaged in racketeering activity, did unlawfully and knowingly attempt to murder individual occupants of the residence located in the 2200 block of South Street in Franklin, Virginia, in violation of Va. Code Ann. §§ 18.2-32, 18.2.-26, and 18.2-18." (JA86).

The government had to prove beyond a reasonable doubt: (1) the existence of a racketeering enterprise; (2) Brooks committed attempted murder under Virginia law; and (3) he committed attempted murder for the purpose of maintaining and increasing his position in any such enterprise. (JA86). As argued above, the government failed to prove the existence of a racketeering enterprise. The government also failed to prove the other two elements—that Brooks committed

attempted murder under Virginia law, and that he did so for the purpose of maintaining and increasing his position in the purported enterprise.

Under Virginia law, attempted murder requires the government to prove: "(1) a specific intent to kill the victim and (2) some overt act in furtherance of that intent." *United States v. Lassiter*, 96 F.4th 629, 636 (4th Cir. 2024) (citing *United States v. Simmons*, 11 F.4th 239, 271 (4th Cir. 2021)) (internal quotations and citations omitted). What constitutes an attempt in Virginia must be ascertained from the common law. *See Jones v. Commonwealth*, 70 Va. App. 307, 317, 826 S.E.2d 908, 913 (Va. Ct. App. 2019) (en banc).

Under the common law, "to constitute an act of attempt, the act must possess four characteristics: first, it must be a step toward a punishable offense; second, it must be apparently (but not necessarily in reality) adapted to the purpose intended; third it must come dangerously near to success; fourth, it must not succeed." *Jones*, 70 Va. App. at 318-19, 826 S.E.2d at 913 (quoting J.H. Beale, Jr., *Criminal Attempts*, 16 Harv. L. Rev. 491, 492 (1903)). "[M]ost courts and commentators on the subject agree with Justice Oliver Wendell Holmes, Jr.'s observation that '[a]s the aim of the law is not to punish sins, but is to prevent external results, the act done must come pretty near to accomplishing that result before the law will notice it.'" *Id.*, 70 Va. App. at 318, 826 S.E.2d at 914 (quoting *Commonwealth v. Kennedy*, 170 Mass. 18, 20, 48 N.E. 770 (1897)).

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by the circumstances." *Secret v. Commonwealth*, 296 Va. 204, 228, 819 S.E.2d 234, 248 (2018) (citations omitted). "Indeed, intent may be, and most often is, proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts." *Id.* (quoting *Viney v. Commonwealth*, 269 Va. 296, 301, 609 S.E.2d 26 (2005)).

In this case, the government failed to prove that Brooks had the specific intent to commit murder and that his actions constituted an attempt to murder under Virginia law. Cynthia Barnes testified that she had lived at the South Street house for 18 years. (JA569). While her two sons, Lorenzo and Loron ("Tooth") had lived with her at some point during those 18 years, she was living alone at the time her house was shot at. (JA569). Barnes was asleep with the lights turned off when, at approximately 3:00 a.m., she was awakened by the sound of gunshots. (JA569-570). She heard one bullet hit over her front door; one came above her bedroom window and hit the ceiling fan; and one went into her attic. (JA569).

The government presented evidence that Edward and Brooks wanted to find Tooth to retaliate for Brandon's murder. They happened to drive by Ms. Barnes's house, and Brooks fired three shots into the house. There was no evidence that anyone wanted to harm Ms. Barnes or that the shots were fired into the house in an attempt to kill Tooth. First, there was no evidence that anyone, much less Tooth,

was in the house at the time. The lights were turned off and no evidence was introduced that there were cars outside or activity in the house, to indicate that anyone was at home. The government presented no evidence that Tooth had been at the house recently or that Brooks believed he was there.

Second, the shots that were fired into the house were all aimed high up and would not have injured any person, even a person standing inside. Deputy Russell Warren confirmed that all of the bullet damage was high up on house—above the front door, above the bedroom window (skimming the ceiling), and in the attic (JA556-558). The shots were fired in the early morning, when most people are asleep. There were no lights on, indicating that any occupant would be lying in bed, asleep. This was a one-story single-family home, and a person seeking to shoot someone inside easily could have aimed a shot lower, through the windows. There was no reasonable likelihood that the shots fired above the door frame, above a window, and into the attic, would injure anyone inside the house. The shots were consistent with an intent to only damage property.

With regard to attempts, the Virginia Court of Appeals has stated that, "[p]reparation alone is not enough, there must be some appreciable fragment of the crime committed, it must be in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter, and the act must not be equivocal in nature." *Jones*, 70 Va. App. at 328, 826 S.E.2d at 919

(quoting *Lewis v. Commonwealth*, 15 Va. App. 337, 340, 423 S.E.2d 371 (Va. Ct. App. 1992) (citations omitted)). *See also Howard v. Commonwealth*, 207 Va. 222, 228, 148 S.E.2d 800 (1966) (defining "[a]n attempt as any overt act done with the intent to commit the crime, and which, except for interference of some cause preventing the carrying out of the intent, would have resulted in the commission of the crime").

The principles of Virginia attempted murder are illustrated by the reasoning in *Thacker v. Commonwealth*, 134 Va. 767, 114 S.E. 504 (Va. 1922). There, the defendant and two companions, all intoxicated, came upon a tent where a woman and her four children were camping. There was a lighted lamp on a trunk by the head of the woman's bed. After being refused shelter for the night, the men continued down the road. *Id.* 134 Va. at 769, 114 S.E. at 505. The defendant was heard saying that he was going to shoot the light out, and fired three shots. Two shots went through the tent, one passing through the head of the bed in which the woman was lying, just missing her head and the head of her baby, who was sleeping with her. *Id.* At trial, the defendant testified that he had no ill will against the occupants of the tent, but shot at the light with no intent to harm anyone. Nevertheless, he was convicted of attempted murder. *Id.*

The Supreme Court of Virginia reversed. The court reasoned that, "[t]he law does not presume, because an assault was made with a weapon likely to produce

death, that it was an assault with the intent to murder." *Thacker*, 134 Va. at 770, 114 S.E. at 505. The court rejected the argument that general malevolence was sufficient to show specific intent to murder. Rather, "[a] man actuated by general malevolence may commit murder though there is no actual intention to kill; to be guilty of an attempt to murder there must be specific intent to kill." *Id.* 134 Va. at 771, 114 S.E. at 506.

The specific intent to kill, or lack thereof, may be inferred from the circumstances. *See Secret*, 296 Va. 204, 819 S.E.2d 234 (holding there was sufficient evidence of intent to commit murder where the defendant poured gasoline and diesel fuel in and around a dwelling and set fire to it, knowing it was occupied by numerous people).

It is helpful to compare the outcomes in two traffic stop cases decided by the Supreme Court of Virginia. In both cases, a vehicle was stopped and the driver decided to flee in his car, endangering the officer. The defendant in each case claimed he was only trying to escape and did not have the intent to kill. Each was convicted of attempted murder and appealed.

In *Coles v. Commonwealth*, 270 Va. 585, 621 S.E.2d 109 (2005), the Supreme Court of Virginia affirmed the attempted murder conviction. The court reasoned that the "defendant drove the Honda, not straight ahead where there was plenty of room to make a right turn, but swerved to the left and aimed the Honda directly

32

toward the officer and the police vehicle . . . causing [the officer] to 'jump back' to avoid injury." *Id.* 270 Va. at 591, 621 S.E.2d at 111. In that case, there was sufficient evidence to infer intent to murder where the defendant aimed his car at the officer.

A different outcome resulted in *Baldwin v. Commonwealth*, 274 Va. 276, 645 S.E.2d 433 (2007). There, the officer was standing next to the driver's window when the defendant turned his vehicle in the direction of the road, which was also toward the officer, drove into the road, and sped off, as the officer pushed off the back of the car to keep the rear wheels from running over his feet. The Supreme Court of Virginia reversed the conviction for attempted murder. The court reasoned that the driver did not aim his vehicle directly toward the officer and, even if the officer had not pushed away, the vehicle at most would have struck his feet. *Id.* at 282, 645 S.E.2d at 435. These cases illustrate that intent to kill cannot be inferred by mere endangerment with a deadly weapon. There must be something more to show that the defendant actually intended that his actions would kill someone.

In this case, there was evidence of intent to injure property and nothing more. All three shots were aimed high above the place where any occupant of the house was likely to be. The facts fail to show that any attempt was "in such progress that it will be consummated unless interrupted by circumstances independent of the will of the attempter." *Jones*, 70 Va. App. at 328, 826 S.E.2d at 919. To the contrary, nothing interrupted Brooks's actions here. He completed the act that he intended:

33

he damaged property by shooting into the house in a way that no one would be injured.

In addition, the government failed to prove the third required element, that the shooting was committed in order to increase or maintain his position in the enterprise. The government presented evidence that Edward and others wanted to kill Tooth in retaliation for Brandon's murder. Certainly, there was no evidence that anyone discussed shooting at Ms. Barnes's house. Looking at the evidence in the light most favorable to the government, the most that can be said is that Brooks took it upon himself to shoot at the house as they passed by. While the government argued that killing Tooth was expected of the defendants, there was no evidence that there was any expectation or plan to shoot at Ms. Barnes' house. The government presented no evidence that the shooting was done for the purpose of maintaining or increasing position in the enterprise. But for Edward looking back, no one would have known that Brooks had fired the shots. As such, there was no potential for the shooting to increase his standing in any purported enterprise.

For the foregoing reasons, Brooks's conviction for attempted murder must be reversed.

C.    <u>Brooks's Conviction In Count Three, For Use Of A Firearm In The Attempted Murder Charged In Count Two, Must Be Vacated</u>.

Count Three charged Brooks with "knowingly discharge, carry, and use a firearm during and in relation to, and did knowingly possess a firearm in furtherance

of, a crime of violence." (JA87).  The crime of violence referenced was the attempted

murder charged in Count Two.  This conviction must be vacated for two independent

reasons.

      i.    Brooks's conviction for use of a firearm must be vacated because
           there was insufficient evidence of attempted murder.

As argued above, Brooks's conviction for attempted murder should be

reversed.  If the conviction for attempted murder in Count Two is reversed, then his

conviction in Count Three, predicated on the attempted murder, must be vacated.

*See United States v. Simmons*, 11 F.4th 239, 261 (4th Cir. 2021) (vacating

convictions under § 924(c) after holding that the RICO conspiracy, upon which the

convictions were predicated, was not a qualifying crime of violence).

      ii.    Virginia Attempted Murder is Not a Valid Predicate Crime of
           Violence Under 18 U.S.C. § 924(c).

If Brooks's conviction for attempted murder in Count Two is upheld, his

conviction under Count Three should nevertheless be vacated because the offense of

Virginia attempted murder fails to qualify as a valid predicate offense.  18 U.S.C. §

924(c) establishes enhanced penalties if a person uses or carries a firearm during and

in relation to a crime of violence or a drug trafficking crime.  Section 924(c)(3)(A)

defines a "crime of violence" as a felony offense that "has as an element the use,

attempted use, or threatened use of physical force against the person or property of

another." *Id.*[8]  To determine whether an offense satisfies this definition, a court must apply the categorical approach, which looks only at the elements necessary to sustain the conviction.  *See United States v. Taylor*, 596 U.S. 845, 850 (2022); *United States v. Redd*, 85 F.4th 153, 171 (4th Cir. 2023).  The court must determine whether the least serious conduct necessary to sustain the conviction still satisfies the use of force requirement.  *See United States v. Davis*, 53 F.4th 168, 171 (4th Cir. 2022) (stating that "[i]f the least culpable conduct punished by the underlying offense can be committed without the use, attempted use, or threatened use of force, then the offense is not categorically a crime of violence.") (internal quotations and citation omitted).

In *United States v. Lassiter*, 96 F.4th 629 (4th Cir. 2024), this court held that Virginia attempted murder is a crime of violence that qualifies as a predicate offense under § 924(c).  *Id.* at 636-37.  In so holding, this court reasoned that that both first and second degree murder in Virginia have been held to be crimes of violence.  *Id.* at 636-37 (citing *United States v. Mathis*, 932 F.3d 242, 265 (4th Cir. 2019); *United States v. Manley*, 52 F.4th 143, 149, 151 (4th Cir. 2022)).  And, because § 924(c)(3)(A) includes the attempted use of force, this court concluded that attempted

---

[8] Section 924(c)(3)(B), which alternatively defined a "crime of violence" as a felony "that by its nature, involves a substantial risk that physical force may be used . . . " was held to be unconstitutionally vague in *United States v. Davis*, 139 S.Ct. 2319 (2019).

36

murder under Virginia law is also a crime of violence. *Lassiter*, 96 F.4th at 636-37. Underpinning this decision was the court's reasoning that that murder requires the actual use of force against another and, therefore, every attempt to commit murder involves the attempted use of force against another, which falls within §924(c)'s the use of force definition. *Id.* at 637-38 (citing *Mathis* 932 F.3d at 265; *Manley*, 52 F.4th at 151; *United States v. Taylor*, 979 F.3d 203, 209 (4th Cir. 2020)).

However, this court's ruling in *Lassiter* did not consider that Virginia attempted murder could be committed by omission—in other words, by no act at all. Virginia's murder statute explicitly encompasses murder "by poison, lying in wait, imprisonment, starving . . . " *See* Va. Code §18.2-32. Thus, a person could be convicted of murder by withholding food, which is a non-action, and certainly not a use of force or attempted use of force. This falls outside § 924(c)'s use of force definition, which contemplates that "a person actively employs physical force." *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004). Furthermore, the force contemplated under § 924(c)(3)(A) is violent physical force. *See Johnson v. United States*, 559 U.S. 133 at 163 (2010) (holding that actual and intentional touching, the force necessary to commit common law misdemeanor battery, did not require the necessary degree of force to qualify as a violent felony under 18 U.S.C. § 924(e), which has a similar use of force clause).

Virginia law explicitly states murder can be committed by omission—by withholding food. Crimes that can be committed by failing to act do not categorically involve the "physical force" required under § 924(c). This issue is pending in the Supreme Court in *Delligatti v. United States*, 23-825, with oral argument scheduled for November 12, 2024.[9]

<u>Conclusion</u>

For the foregoing reasons, Brooks respectfully requests that this court reverse his convictions for Counts One, Two, and Three.

## III.[10] THERE WAS LEGALLY INSUFFICIENT EVIDENCE THAT NEWSOME CONSPIRED TO COMMIT VICAR MURDER AS CHARGED IN COUNT ONE.

<u>Standard of Review</u>

The Court reviews the sufficiency of the evidence to determine if a reasonable jury could have found the elements of the offense beyond a reasonable doubt. *United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994).

---

[9] In *Delligati*, the question presented is: "Whether a crime that requires proof of bodily injury or death, but can be committed by failing to take action, has as an element the use, attempted use, or threatened use of physical force."

[10] Sections III, IV and V of Appellants' Brief were drafted primarily by counsel for Newsome.

<u>Discussion</u>

Newsome moved for a judgment of acquittal on both counts at the close of the prosecutor's case. (JA1502). He renewed his motion at the close of his case. (JA1789). Both motions were denied but should have been granted.

Like Jenkins, Newsome was charged in Count One with conspiracy to commit VICAR Murder from December 17 to 19, 2017. As explained <u>supra</u>, to prove the VICAR conspiracy charge under 18 U.S.C. § 1959(a)(5), prosecutors had to show that (1) "Brandon's crew" was an enterprise; (2) it was engaged in racketeering activity; (3) the defendant had a position in the enterprise; (4) he committed the alleged crime of violence; and (5) his general purpose in so doing was to maintain or increase his position in the enterprise.

In deciding the motion for judgment of acquittal under Rule 29, the district court had to "decide whether there was sufficient evidence that each defendant conspired to commit the violent crimes charged" and "determine whether each defendant committed the violent acts or agreed to commit the acts for the purpose of maintaining or increasing his position in the enterprise." *U.S. v. Fiel*, 35 F.3d 997, 1004 (4th Cir. 1994). Accordingly, it is not enough to show that a defendant's prior racketeering acts were committed for the purpose of maintaining or increasing his position in the charged enterprise. The evidence must prove that he conspired to commit the particular violent indicted act(s)– in Newsome's case, the shootings that

took place on or about December 17 to 19, 2017 – for the purpose of maintaining or increasing his position in that enterprise. "VICAR's purpose element demands a closer tie between the purpose of maintaining or increasing position in the enterprise and the commission of the assault or murder." *United States v. Manley*, 52 F.4th 143, 153 (4th Cir. 2022).

Since the charge against Newsome is conspiracy, not commission of the violent act, the evidence must show that he knowingly entered the conspiracy to commit the charged violent act, not just a conspiracy to be part of the enterprise in general. If the latter were the case, anyone who joins an enterprise could be convicted of any crime committed by anyone in the enterprise at any time thereafter regardless of whether or not he had the intent to conspire to commit the charged crime.

Conceding in summation that Newsome was not present when the violent acts took place, the prosecutor argued that the conspiracy Newsome entered took place at the meeting held "the first night" "inside the Railroad house" in the "early morning hours" of December 18, 2017, where they agreed "to kill Loron Barnes and Shuntrel McNear." (JA1612-1614, JA1620, JA1629). The prosecutor said that the violent act underlying Count One was the South Street shooting by Brooks on December 18, 2017. (The government did not claim Newsome conspired with Jenkins to shoot McNear on February 8, 2019, which is the violent act in aid of racketeering

underlying Counts Four, Five, and Six. An alleged third shooting on December 19, 2017, was not indicted.)

Accepting the evidence in a light most favorable to the prosecutor, no reasonable jury could find beyond a reasonable doubt that Newsome conspired to murder for the purpose of maintaining or increasing his position in the so-called enterprise.

Concerning the Railroad Avenue meeting where the conspiracy was allegedly entered, three witnesses testified. First, Edward inculpated Newsome. Edward said that a few days after his brother was killed, he was home at Railroad when a female friend came by to say that the boys who killed Brandon were on Madison Street. Jenkins, Rahlo, Red (Malik Newsome, the appellant), Yae, Animal, and others were present. They allegedly planned to kill the assailants. Newsome, Animal, Yae, and another left for Madison Street. (JA1206-1207). Edward did not see what happened there.

Edward's credibility was too suspect to serve as a basis for Newsome's conviction. Edward testified he had several convictions for racketeering, guns, and drugs. In return for a plea deal and lower sentence in a pending drug and firearms case, he agreed to testify in this case. He testified he lied to the police about this case many times and has lied to police many other occasions. (JA1156; JA1256).

In any event, the testimony of the second witness, Derrick Griffin, was exculpatory, taken in a light most favorable to the prosecutor. Griffin said the evening Brandon was killed he went to Railroad, met with lots of angry people, and discussed revenge against Tooth and Khary with Edward leading the discussion. (JA520, JA522-523). Later that night, they met again including Malik's brother, Eugene Newsome. (JA525). E.J., Choppa, Deon, and Jenkins left the house. (JA526). Griffin did not see the appellant join the others who left to do shooting. He did not testify that Newsome participated in the discussion to seek revenge or engage in the shooting. Malik was present at the meeting, Griffin testified, but he gave no testimony from which a reasonable factfinder could conclude that Malik participated in the conspiracy to murder.

The third witness, Tony Sledge, also gave exculpatory testimony. He told jurors that at the end of December, 2017, Edward called and said that Brandon was missing. He and others, including Newsome, met at the Railroad Avenue hangout. They left to find Brandon and later learned that Brandon's body was found in a ditch. (JA779, JA823). A couple of days later Sledge was at the Railroad when they learned that the boys who killed Brandon were on Madison Street. They decided to retaliate by shooting Brandon's assailants. The appellant's brother, Eugene Newsome, but not the appellant Malik Newsome, participated in forming the murderous plan, Sledge testified. Sledge later heard gunshots. According to Sledge,

42

it was Eugene Newsome, not Malik Newsome, who conspired to kill at Madison Avenue. (JA780, JA782, JA828).

Because of the conflicting testimony of the prosecution's witnesses and the manifest lack of credibility of one of them, no reasonable jury could have found beyond reasonable doubt that Newsome conspired to murder anyone.

Nor could a reasonable jury have found that that Newsome conspired to commit the alleged violent act "for the purpose of maintaining or increasing his position in the gang." (18 U.S.C. § 1959[a][5].) There was absolutely no evidence that Newsome participated in a conspiracy to commit the specific shootings in this case for the purpose of positioning himself in a gang, as opposed to committing the act for purely personal reasons. In fact, there was no evidence that anyone who engaged in the charged acts did so to maintain or gain advantage within any "enterprise," as opposed to seeking revenge for the murder of their friend or brother, Brandon.

There was no testimony or other evidence about the nature of the conversations at the Railroad that might lead a fact finder to hold that the acts of retaliation were done to gain credibility in an enterprise. None of the many texts, emails, conversations, and letters admitted at trial showed it. None of the witnesses claimed it. For this reason, too, no reasonable jury could have found beyond reasonable doubt that Newsome conspired to commit a VICAR-related murder to

obtain or maintain or increase his position in the enterprise charged in the Second Superseding Indictment.  For these reasons, judgment against Newsome should be reversed on Count One.

## IV.  THERE WAS LEGALLY INSUFFICIENT EVIDENCE THAT NEWSOME TAMPERED WITH WITNESSES.

<u>Standard of Review</u>

The Court reviews the sufficiency of the evidence to determine if a reasonable jury could have found the elements of the offense beyond a reasonable doubt.  *United States v. Fiel*, 35 F.3d 997 (4th Cir. 1994).

<u>Discussion</u>

The grand jury charged that Newsome phoned Ms. Bynum and Ms. Goodwyn on or about July 31, 2023, and asked them to testify about his alibi at trial.  For this, Count Nine charged witness tampering under 18 U.S.C. § 1512(b)(1), which states:

> Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to influence, delay or prevent the testimony of any person in an official proceeding; shall be fined under this title or imprisoned not more than 20 years, or both.

Concerning Count Nine, the district court charged the jury as follows:

> Count Nine of the Second Superseding Indictment charges that, on or about July 31, 2023, within the Eastern District of Virginia, the defendant Malik Trevonte Newsome, AKA "Red," AKA "Hitman Redd," did knowingly intimidate, threaten, <u>and</u> corruptly persuade one or more persons, <u>and</u> attempt to do the same, with the intent to influence, delay, <u>and</u> prevent the testimony of one or more persons in an official proceeding…. (JA1602).  (*emphasis added*)

44

Addressing Newsome at sentencing, the district court acknowledged, "It is true that you did not engage in threats. That is undoubtedly true." (JA2068).

Ms. Goodwyn testified that in August, 2023, Newsome phoned and asked her to confirm that she was with him when one of the shootings occurred which, she said, was "very well true." (JA887, JA891, JA893). She never testified she was threatened, intimidated, corruptly persuaded, or misled by Newsome or that he attempted to do so. Two elements of Count Nine were absent therefore: Newsome never influenced, delayed or prevented Ms. Goodwyn from testifying, and he never threatened, intimidated, corruptly persuaded or misled her or tried to. He asked Ms. Goodwyn to testify about his true alibi, which is not a criminal act.

Ms. Bynum testified that on July 30, 2023, she got a phone call from Newsome who asked if she would testify on his behalf about his alibi. She said yes and hung up. (JA886-887). Ms. Bynum testified she was never "threatened or anything of the sort" by Newsome. Nor did she testify, or was even asked by the prosecutor, if Newsome's alibi was untrue in any way.

This was the extent of the testimony concerning Count Nine for the period alleged in the indictment. None of the allegedly tampered witnesses testified that they were intimidated, threatened, corruptly persuaded, or mislead by Newsome. The district court acknowledged that Newsome never threatened the witnesses.

Nor did the evidence show that Newsome did all four – knowingly intimidate, threaten, <u>and</u> corruptly persuade <u>and</u> attempt to do the same – as the court charged the jury.  Although the court did go on to list the elements of the crime in the alternative (JA1603), it cannot be said on hindsight that the jury did not follow the court's initial instructions and convict Newsome for committing all four acts when the prosecutor, at summation, claimed he engaged in only one of the four acts: Attempt to corruptly persuade the witnesses to give false testimony about a made-up alibi at trial.  (JA1631-1632).

For these reasons, no reasonable jury could have convicted Newsome of Count Nine.  Judgment should be reversed.

## V.    NEWSOME SHOULD HAVE BEEN GRANTED A DOWNWARD SENTENCE VARIANCE AND TWO POINTS SHOULD NOT HAVE BEEN ADDED UNDER U.S.S.G. § 2C1.1.

<u>Standard of Review</u>

Sentence length is reviewed under a deferential abuse-of-discretion standard for reasonableness.  *Gall v. United States*, 552 U.S. 38 (2007).

<u>Discussion</u>

Newsome was sentenced to 273 months (22 ¾ years) in prison including 120 months for conspiracy and 153 consecutive months for witness tampering.  The court adopted the PSI calculation of criminal history V based on 11 points and a total offense level of 39.  This included a base offense level of 33, four levels because a

46

victim sustained a life-threatening injury, and two levels for obstruction of justice for asking witnesses to testify on his behalf. (U.S.S.G. §§ 2E1.3(a)(2); 2A2.1(a)(1), (b)(1)(A); U.S.S.G. § 3C1.1 Application Note 8)).

Newsome sought (JA1878) a total sentence of 60 months for tampering, considering his actions were non-threatening and not really tampering, as discussed earlier in this brief. (See also, JA1950). To get there, he argued for a downward departure of 27 months under U.S.S.G. 5G1.2(b) which he received. He also sought a downward variance of 153 months under 18 U.S.S.G. § 3553(a) which he did not receive. That was an error. The variance should have been granted.

In support of a variance, Newsome noted that he was 31 years old; his father killed himself when he was seven years old; he had three young kids; he was schizophrenic, bipolar, and suffered from post-traumatic disorder, for which he needed mental health treatment; and he did not have an unusually bad criminal record. The PSI made the same findings concerning his background. (JA2187-2188). Newsome argued that his conviction for tampering increased his exposure from 10 to 20 years and that was unfair, considering the weakness of the prosecutor's case for tampering.

At sentencing, the district court said, "(I)t is clear to the Court, based upon the evidence at trial, that you – the evidence the government presented suggests that you are the least culpable of the three (*defendants*)." (JA2073). The court acknowledged

that Newsome did not engage in the actual shootings and was seen at various times in possession of one of the guns that was used by Jenkins and Brooks during the Madison Street shooting but did not actually use it. While it was true that "he did not engage in threats" when contacting potential witness, he used the word "alibi" in his call to his child's mother and his efforts were "extensive," including 36 attempted phone calls in about 45 days. (JA2068). Finally, said the court, Newsome "has never been married but has three children." (JA2070).

The district court failed to give serious consideration to Newsome's motion for a variance or adequately explain the sentence that it imposed. *United States v. Rodriguez*, 828 Fed. Appx. 186, 187 (4th Cir. 2020). As the district court acknowledged, Newsome was less culpable than his co-defendants because he did not participate in any of the violent acts charged and did not threaten the witnesses. Despite this, he received substantially the same sentence for conspiracy as Jenkins did for the actual attempted murder and being a felon in possession of ammunition. This violates the prohibition against unwarranted sentence disparities among co-defendants with similar records under 18 U.S.C. § 3553(a)(6).

Newsome was entitled to a variance for the additional reason that his contacts and attempts to contact witnesses were not violent or threatening, as the district court noted (JA2058). Nor was there evidence beyond a reasonable doubt that he intimidated, corruptly persuaded, or misled the witnesses to testify falsely: Ms.

Goodwyn testified Newsome's alibi may well have been true and prosecution witness Ms. Bynum was silent on this issue, having not been asked about its truth or falsity by the prosecutor.

*Gall v. United States*, 552 US 38 (2007) establishes the procedure for arriving at a fair sentence. First, the district court must determine the correct sentence under the Guidelines. *Rita v. United States*, 551 U.S. 338, 351 (2007). Then, taking into consideration the factors in 18 U.S.C. § 3553(a) it must make an individualized assessment based on the arguments and facts presented. *Gall* at 50. The Court shall consider potential variances from the Guidelines range that may be supported by the evidence and arguments and impose a sentence which is sufficient, but not greater than necessary to comply with the purposes set forth in the Guidelines and 18 USC § 3553(a). *United States v. Booker*, 543 U.S. 220 (2005) "(D)istrict courts have extremely broad discretion when determining the weight to be given each of the § 3553(a) factors, and the fact that a sought variance sentence deviates, even significantly, from the Guidelines range does not alone render it presumptively unreasonable." *United States v. Jones*, 2023 U.S. App. LEXIS 30545, *3-4, (4th Cir. 2023).

A downward variance in Newsome's sentence was justified under 18 U.S.C. § 3553(a)(1) considering the lack of evidence of the key elements of the offenses, as well as 18 U.S.C. § 3553(a)(2) considering the lack of seriousness of his

communications with the witnesses.  His communications with Ms. Bynum and Ms. Goodwyn did not satisfy any of the elements of the crime.  Neither testified they felt threatened, coerced, corruptly persuaded or misled.  Ms. Bynum testified just the opposite: She did not feel "threatened or anything of the sort."  (JA887).  Ms. Goodwyn testified that the alibi, which Newsome encouraged her to testify to, was "very well true."  (JA891, JA893).  This, combined with the district court's failure to explain its sentence of 153 consecutive months on Count Nine under 18 U.S.C. § 3553(c) and the disparity in sentences among co-defendants under 18 U.S.C. § 3553(a)(6) renders Newsome's consecutive sentence for Count Nine procedurally unreasonable.  *United States v. Davenport*, 445 F.3d 366, 372 (4th Cir. 2006).

For these reasons, the district court should have granted Newsome a downward sentence variance.  For the same reasons, the imposition of two points under U.S.S.G. § 3C1.1 for obstructing or impeding the administration of justice was unwarranted.  *United States v. Napan*, 484 Fed. Appx. 780, 781 (4th Cir. 2012).  Without the addition of these two points, Newsome's Guidelines range would have been 37 instead of 39.  The impact of this difference on the sentencing court is unknown on hindsight.

<u>Conclusion</u>

For the foregoing reasons, Newsome respectfully asks the Court to reverse the judgment and vacate his sentence.

## CONCLUSION

For the foregoing reasons, the Court should reverse convictions of Appellants Jenkins, Newsome and Brooks and remand for resentencing.

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request an opportunity to argue orally in support of their appeal. Oral argument should prove beneficial to the Court as it considers the evidentiary and sentencing issues raised in this Brief of Appellants.

Respectfully submitted,

/s/ Paul G. Beers
Paul G. Beers (VSB No. 26725)
Glenn, Feldmann, Darby & Goodlatte
111 Franklin Road, S.E., Suite 200
P. O. Box 2887
Roanoke, Virginia 24001-2887
Telephone (540) 224-8000
Facsimile (540) 224-8050
E-mail: pbeers@glennfeldmann.com
Counsel for Ronald Damone Jenkins, Jr.

/s/ Mark Diamond
Mark Diamond
Box 388 Pound Ridge
Pound Ridge, New York 10576-9919
Telephone: (917) 660-8758
Email: markd53@hotmail.com
Counsel for Malik Trevonte Newsome

/s/ Sicilia Englert
Sicilia C. Englert
Law Office of Sicilia C. Englert, LLC
1800 Diagonal Road, Suite 600
Alexandria, Virginia 22314
Telephone: (703) 636-2261
Email: sicilia.englert@englertlawoffice.com
Counsel for Japree Lortez Brooks

<u>**CERTIFICATE OF COMPLIANCE**</u>

1.      This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[ X ] this brief contains [*11,730*] words.

[   ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2.      This brief complies with the typeface and type style requirements because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 365*] in [*14pt Times New Roman*]; *or*

[   ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

Dated:  <u>October 9, 2024</u>                    <u>/s/ Paul G. Beers</u>
                                                        *Counsel for Appellant*
                                                        *Ronald Damone Jenkins, Jr.*

                                                        <u>/s/ Mark Diamond</u>
                                                        *Counsel for Appellant*
                                                        *Malik Trevonte Newsome*

                                                        <u>/s/ Sicilia Englert</u>
                                                        *Counsel for Appellant*
                                                        *Japree Lortez Brooks*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 9th day of October, 2024, I caused this Brief of Appellants and Joint Appendix to be filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Jacqueline Romy Bechara
Office of the U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia  22314
(703) 299-3819

Kristen Shannon Taylor
Office of the U.S. Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia  23510

*Counsel for Appellee*

I further certify that on this 9th day of October, 2024, I caused copies of the Sealed Volumes and Media Volume of the Joint Appendix to be served, via FedEx, upon counsel for the Appellee, at the above addresses.

/s/ Paul G. Beers
*Counsel for Appellant*
*Ronald Damone Jenkins, Jr.*

/s/ Mark Diamond
*Counsel for Appellant*
*Malik Trevonte Newsome*

/s/ Sicilia Englert
*Counsel for Appellant*
*Japree Lortez Brooks*